IN THE UNITED STATES DISTRICT COURT

FOR THE EASTERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| CAHTO TRIBE OF THE LAYTONVILLE RANCHERIA,<br><br>  Plaintiff,<br><br>  v.<br><br>AMY DUTSCHKE, Regional Director for the Pacific Region, Bureau of Indian Affairs, United States Department of the Interior, KEN SALAZAR, Secretary of the Interior, United States Department of the Interior, LARRY ECHO HAWK, Assistant Secretary – Indian Affairs, United States Department of the Interior,<br><br>  Defendants.* | 2:10-cv-01306-GEB-GGH<br><br>**TENTATIVE RULING** ON CROSS MOTIONS FOR SUMMARY JUDGMENT ON THE ONLY ISSUES THAT ARE NOT SUBMITTED FOR DECISION |

Cahto Tribe (the "Tribe") seeks an order under the Administrative Procedures Act ("APA") vacating and reversing the Bureau of Indian Affairs' ("BIA") administrative decision that ordered the Tribe to re-enroll 22 members of the Sloan/Hecker family who were dis-enrolled by the Tribe in 1995.

---

\* The caption has been amended to substitute Amy Dutschke for Dale Risling under Federal Rule of Civil Procedure 25(d) following the appointment of Amy Dutschke as Regional Director for the Pacific Region.

1

**A.   STANDARD OF REVIEW**

The BIA's decision may be vacated and reversed under the APA only if it is "arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law." 5 U.S.C. § 706(2)(A).

**B.   WHETHER THE BIA HAD AUTHORITY TO REVIEW THE TRIBE'S DIS-ENROLLMENT DECISION**

The Tribe argues the BIA's re-enrollment decision is unlawful because its governing documents, consisting of its Articles of Association and Ordinance Number 1, do not authorize the BIA to review the Tribe's dis-enrollment decision. (Pl.'s Mot. 25:10-13.)

The BIA counters that the tribal governing documents do authorize its review of the Tribe's dis-enrollment decision that was appealed; the BIA relies on provisions in the Tribe's governing documents as support for its position. Specifically, the BIA argues that sections 6 through 8 of Ordinance Number 1, "read together", "unquestionably provide for an appeal to the [BIA] for determinations by the Tribe as to eligibility or ineligibility for tribal membership." (Defs.' Reply 4:25; Defs.' Mot. 13:21-14:1.)

Section 6 of Ordinance Number 1 provides: "[a] person disapproved for enrollment" may appeal to the BIA; section 7 states the membership roll is to "be prepared with a certification as to its correctness by the . . . [BIA][;]" and section 8 states the membership roll is to be kept current by "making corrections as necessary, including deleting of names of persons on the roll who were placed there erroneously, fraudulently, [or] otherwise incorrectly[.]" (Administrative Record ("AR") 282, 285.) These sections read in their context provide the BIA authority to review the subject dis-enrollment decision.

**C. WHETHER BIA'S REVERSAL OF THE TRIBE'S DECISION WAS CONTRARY TO LAW**

The Tribe also argues its dis-enrollment decision is based on its interpretation of its own tribal governing documents, and therefore, is an interpretation based on its tribal sovereign authority to which the BIA must give deference. (Pl.'s Mot. 27:3-6.) "[U]nder the doctrines of tribal sovereignty and self-determination, a tribe has the right initially to interpret its own governing documents in resolving internal disputes, and the [BIA] must give deference to a tribe's reasonable interpretation of its own laws." Ransom v. Babbitt, 69 F. Supp. 2d 141, 150 (D.D.C. 1999) (internal quotation marks omitted).

The BIA counters the Tribe's dis-enrollment decision is not based on the Tribe's interpretation of its governing documents, but rather the Tribe's misinterpretation of federal law prescribed in 25 U.S.C. § 1300i et. seq., the Hoopa Yurok Settlement Act, and the Initial Yurok Voter List prepared by the BIA in 1979, prior to the enactment of the Hoopa Yurok Settlement Act. (Defs.' Mot. 23:9-10.)

The Tribe based its decision on Article III(A)(3) of the Tribe's Articles of Association which prescribes: "[p]ersons who meet the requirements [of membership] . . . , shall be ineligible for membership if they have been affiliated with any other tribe, group or band to the extent of (a) being included on a formal membership roll, . . . [or] (c) having been named as a distributee or dependent of a distributee in a reservation distribution plan." (AR 286-87.) "In its September 19, 1995 decision, the [Tribe] found that the [Sloan/Heckers] 'have been affiliated with other tribes by being included on formal membership rolls and/or . . . have been a distributee of a reservation distribution plan, namely the Hoopa/Yurok settlement' and thus were ineligible for membership under Article III.A.3 of the Tribe's Articles

3

of Association." (Pl.'s SUF ¶ 7; Defs.' SUF ¶ 2.) The Tribe relied on the "'Initial Yurok Voter List' dated June 21, 1979" for its conclusion that the Sloan/Heckers "were . . . on the membership rolls of the Yurok Tribe[.]" (Pl.'s Mot. 33:1; AR 223.)

The Tribe argues the Hoopa Yurok Settlement Act is a "distribution of Reservation assets" within the meaning of "reservation distribution plan" in its Articles of Association. (Pl.'s Mot. 32:5.)

However, what the Tribe characterizes as a distribution of reservation assets is a legal settlement with the United States government, which federal law has not defined as a distribution of reservation assets as the Tribe argues. As explained in the Senate Report on the Hoopa Yurok Settlement Act, the Act is intended to "resolve long standing litigation between the United States, the Hoop Valley Tribe and a large number of individual Indians[.]" S. Rep. No. 100-564, at 1 (1988).

25 U.S.C. § 1300i-3 prescribes that the Hoopa Yurok Settlement Act establish the Hoopa-Yurok Settlement Fund, which is composed of "monies derived from the joint reservation which are held in trust" (25 U.S.C. § 1300i (b)(1)) and a federal government monetary settlement contribution of $10,000,000 (25 U.S.C. § 1300i-4(e)). The Senate Report explains "[t]he Fund, with the Federal share and with any earned income, is to be available to make the payments authorized by [25 U.S.C. § 1300i-5(d)]." S. Rep. No. 100-564, at 20.

25 U.S.C. § 1300i-5(d) provides a lump sum payment option; "[t]he option to elect a lump sum payment under this section is provided solely as a mechanism to resolve the complex litigation[.]" 25 U.S.C. § 1300i-5(d)(2).

1  Therefore, the Sloan/Hecker family members who received the
2  lump sum payment option under 25 U.S.C. § 1300i-5(d) did not receive a
3  distribution of reservation assets.
4  Further, contrary to the Tribe's argument, the Initial Yurok
5  Voter List does not constitute a membership roll since the federal
6  register comments state: "the voters' list clearly is not a membership
7  roll for the Yurok Tribe and inclusion on or exclusion from the list is
8  not determinative of whether a person will be eligible for membership in
9  the Yurok Tribe." Organization of the Yurok Tribe-Voting for Interim
10 Tribal Governing Committee; Qualification and Procedures for Preparing
11 a Voting List, 44 Fed. Reg. 24536 (Apr. 25, 1979) (to be codified at 25
12 CFR pt. 55).
13 For the stated reasons, the BIA's decision to order the
14 re-enrollment of the Sloan/Hecker Family is not contrary to law.

Dated:  May 20, 2011

_____
GARLAND E. BURRELL, JR.
United States District Judge