IN THE UNITED STATES DISTRICT COURT

FOR THE EASTERN DISTRICT OF CALIFORNIA

CAHTO TRIBE OF THE LAYTONVILLE )
RANCHERIA,                       )    2:10-cv-01306-GEB-GGH
                                 )
              Plaintiff,         )
                                 )    ORDER GRANTING DEFENDANTS'
          v.                     )    MOTION FOR SUMMARY JUDGMENT
                                 )
AMY DUTSCHKE, Regional Director  )
for the Pacific Region, Bureau   )
of Indian Affairs, United States )
Department of the Interior,      )
KEN SALAZAR, Secretary of the    )
Interior, United States          )
Department of the Interior,      )
LARRY ECHO HAWK, Assistant       )
Secretary – Indian Affairs,      )
United States Department of the  )
Interior,                        )
                                 )
              Defendants.        )
_____)

          Cahto Tribe of the Laytonville Rancheria (the "Tribe") seeks
an order under the Administrative Procedures Act ("APA") vacating and
reversing the Bureau of Indian Affairs' ("BIA") administrative decision
that ordered the Tribe to re-enroll twenty-two members of the
Sloan/Hecker family who were disenrolled by the Tribe in 1995. A hearing
on the pending cross motions for summary judgment was held on May 23,
2011. For the reasons stated below, Plaintiff's motion for summary
judgment is denied, Defendants' motion for summary judgment is granted,
and the BIA's decision is affirmed.

## I. LEGAL STANDARD

The BIA's decision may be vacated and reversed under the APA only if it is "arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law." 5 U.S.C. § 706(2)(A). The reviewing court should reverse an agency decision as arbitrary and capricious "only if the agency relied on factors Congress did not intend it to consider, entirely failed to consider an important aspect of the problem, or offered an explanation that runs counter to the evidence before the agency[.]" The Lands Council v. McNair, 537 F.3d 981, 987 (9th Cir. 2008) (en banc) (citation and internal quotation marks omitted). However, "[p]urely legal questions are reviewed de novo." Howard v. F.A.A., 17 F.3d 1213, 1215 (9th Cir. 1994); see 5 U.S.C. § 706 ("the reviewing court shall decide all relevant questions of law, [and] interpret constitutional and statutory provisions").

## II. UNCONTROVERTED FACTS

### A. Membership in the Tribe

The Tribe "is a federally-recognized Indian tribe." (Pl.'s Statement of Undisputed Facts ("SUF") ¶ 1; Defs.' SUF ¶ 1.) "The Tribe is organized under Articles of Association adopted by the Tribe in 1967 . . . ." (Pl.'s SUF ¶ 2; Defs.' SUF ¶ 1.)

Membership in the Tribe is governed by Article III of the Tribe's Articles of Association. (Pl.'s SUF ¶ 3.) Article III(A) provides that persons eligible for membership are:

> 1. All living persons listed on the official census of the Laytonville Rancheria as of October 31, 1944.
> 2. All living descendants of persons listed on the official census of the Laytonville Rancheria as of October 31, 1944, provided such descendants possess at least one-fourth (1/4) degree California Indian blood.

1  (Articles of Ass'n III(A), Administrative Record ("AR") 286.)

2          Paragraph 3 of Article III(A) provides:

3          Persons who meet the requirements of Article
           III.A.1 and Article III.A.2 shall be ineligible for
4          membership if they have been affiliated with any
           other tribe, group or band to the extent of (a)
5          being included on a formal membership roll, (b)
           having received an allotment or formal assignment
6          of land, (c) having been named as a distributee or
           dependent of a distributee in a reservation
7          distribution plan.

8  Id.

9          "The Tribe has enacted an ordinance governing enrollment,

10 Ordinance No. 1." (Pl.'s SUF ¶ 4.) Ordinance No. 1 "set[s] forth

11 requirements and procedures to govern the enrollment of persons whose

12 names shall be placed on the membership roll of the [Tribe]." (Ordinance

13 No. 1, AR 280.) Section 6 of Ordinance No. 1 concerns "Appeals" and

14 prescribes: "A person disapproved for enrollment shall be notified in

15 writing of the reason(s) for disapproval and informed of his right to

16 appeal to the Area Director, Bureau of Indian Affairs, Sacramento,

17 California, within 30 days following receipt of the rejection notice."

18 Id. 285. Section 7 of Ordinance No. 1 concerns "Membership Roll

19 Preparation" and prescribes: "After final decisions have been rendered

20 on all applications, a roll shall be prepared with a certification as to

21 its correctness by the Enrollment Committee and the Area Director,

22 Bureau of Indian Affairs." Id. 282. Section 8 of Ordinance No. 1

23 concerns "Keeping Membership Roll Current" and prescribes: "Each new

24 Executive Committee . . . shall be responsible for reviewing the

25 membership roll and keeping the roll current by . . . making corrections

26 as necessary including deleting of names of persons on the roll who were

27 placed there erroneously, fraudulently, otherwise incorrectly . . . ."

28 Id.

                                    3

### B. Disenrollment of the Sloan/Hecker Family

"On September 19, 1995 the Tribe's General Council voted to remove from the Tribe's membership 22 individuals, members of a family with the surname Sloan, sometimes described as the Sloans/Heckers." (Pl.'s SUF ¶ 6; Defs.' SUF ¶ 2.) "In its September 19, 1995 decision, the General Council found that the Sloans 'have been affiliated with other tribes by being included on formal membership rolls and/or * * * have been a distributee of a reservation distribution plan, namely the Hoopa/Yurok settlement' and thus were ineligible for membership under Article III.A.3 of the Tribe's Articles of Association." (Pl.'s SUF ¶ 7; Defs.' SUF ¶ 2.)

"Soon after the Tribe's disenrollment decision, on September 29, 1995, an attorney representing the Tribe requested the BIA's recognition of the disenrollment action." (Defs.' SUF ¶ 4.) "On October 4, 1995, the [BIA] Superintendent responded stating that the matter was internal to the Tribe and that he had referred it to the Tribe's Executive Committee." Id.

"From 1995 to 1999, BIA officials declined requests by the Sloans and others to intervene and maintained that the Tribe's disenrollment action was an internal matter." (Pl.'s SUF ¶ 11.)

"On May 13, June 24, and August 2, 1999, Gene Sloan, one of the disenrolled individuals, wrote to the Regional Director and formally requested an appeal regarding the Tribe's disenrollment decision and the removal of the Sloan/Heckers from the Tribe's membership rolls." (Defs.' SUF ¶ 7; Pl.'s SUF ¶ 9.) The BIA did not act on Gene Sloan's appeals until 2009. (2009 Decision, AR 1-5.)

"[I]n July 1999, after receiving additional complaints from some of the disenrolled individuals, the Superintendent [of the BIA]

4

wrote to the Tribe and asked that the Tribe reconsider its disenrollment decision." (Defs.' SUF ¶ 5.) "Following this communication, the BIA corresponded and met with Tribal officials concerning the disenrollment decision, . . . and as a result, the Tribe agreed to attempt to resolve the matter internally." Id. ¶ 6.

### C. First BIA Decision and Subsequent Appeals

"On February 18, 2000, the Superintendent wrote to the Tribe's Chairperson acknowledging receipt of a letter . . . informing the Superintendent that the Tribe's efforts to resolve the matter internally had been unsuccessful and requesting . . . that the dispute be referred to a formal mediation service." (Defs.' SUF ¶ 8; Pl.'s SUF ¶ 12.) "The Superintendent did not respond to the attorney's request for referral to mediation, but instead, informed the Chairperson that . . . the BIA had not changed its initial position and did not recognize the Tribe's disenrollment decision." Id.

"The Tribe appealed the Superintendent's decision dated February 18, 2000 to the Regional Director [of the BIA]." (Pl.'s SUF ¶ 13; Defs.' SUF ¶ 9.) "On December 19, 2000, the Regional Director issued a decision stating that he fully supported the Superintendent's decision not to recognize the Tribe's disenrollment decision." (Defs.' SUF ¶ 10; Pl.'s SUF ¶ 16.)

"The Tribe appealed the Regional Director's December 19, 2000 decision to the IBIA [(Interior Board of Indian Appeals)]." (Pl.'s SUF ¶ 17; Defs.' SUF ¶ 11.) "By an opinion and order entered on December 19, 2002, the IBIA vacated the Regional Director's and Agency Superintendent's decisions." (Pl.'s SUF ¶ 22; Defs.' SUF ¶ 12.) In its decision, the IBIA did "not reach the merits of the enrollment dispute because it agree[d] with the Tribe that the BIA officials lacked

decision-making authority in the circumstances [in which the issue arose]." <u>Cahto Tribe of Laytonville Rancheria v. Pac. Reg'l Dir., Bureau of Indian Affairs</u>, 38 IBIA 244, 246 (2002).

### D. Second BIA Decision and Current Appeal

"From the date of the IBIA's 2002 decision . . . until shortly before March 26, 2009, the Tribe heard nothing from the Bureau of Indian Affairs to suggest that any issues regarding . . . the Tribe's September 19, 1995 decision were unresolved or pending." (Pl.'s SUF ¶ 25.)

"On October 3, 2008, an attorney for the Sloan/Heckers wrote to the Regional Director 'on behalf of Mr. Gene William Sloan of Laytonville Rancheria and the members of his family,' and advised the Regional Director that the BIA had never taken action on Mr. Sloan's 1999 appeals." (Defs.' SUF ¶ 15.) "Four months later, when the BIA still had not acted on Mr. Sloan's 1999 appeals, the Sloan/Heckers' attorney wrote to the Regional Director again . . . ." <u>Id.</u> ¶ 16.

"On March 26, 2009 the Regional Director issued a decision [(the '2009 Decision')] in which he assumed jurisdiction over the enrollment matter in response to Mr. Sloan's appeals dated May 13, June 24 and August 2, 1999 and citing 25 C.F.R. Part 62." (Pl.'s SUF ¶ 26; Defs.' SUF ¶ 17.) The Regional Director stated: "after reviewing the Tribe's disenrollment action, the Tribe's misinterpretation of the Hoopa/Yurok Settlement Act, and its mis-application of Article III of its Articles of Association violated members rights under federal law." (2009 Decision, AR 005). The Regional Director then "instruct[ed] the General Council to place the Sloan/Hecker Family members names on the Tribe membership roll immediately." <u>Id.</u>

Subsequently, the Tribe filed this action in federal court challenging the BIA's 2009 Decision under the APA. (Compl. ¶ 1.) The

Tribe alleges the following five claims in its Complaint: 1) the principles of res judicata and administrative finality barred the BIA from rendering its 2009 Decision; 2) the BIA's decision is in excess of statutory authority and contrary to law; 3) the BIA failed to defer to the Tribe's interpretation of tribal law regarding eligibility for membership; 4) the BIA's decision was arbitrary and capricious and unwarranted by the facts; and 5) the BIA's decision is contrary to federal regulations. Id. ¶¶ 25-44.

### III. DISCUSSION

### A. The IBIA'S 2002 Decision

The Tribe argues the BIA "was precluded by [the IBIA] decision from relitigating the IBIA's determination that the BIA lacked jurisdiction to review the Tribe's 1995 decision to disenroll the Sloans." (Pl.'s Mot. 13:5-8.) Defendants counter "there has been no final judgment on the merits concerning the BIA's jurisdiction to review the Tribe's disenrollment decision in the circumstances presented in this case, i.e., in the context of Gene Sloan's 1999 appeals from the disenrollment decision." (Defs.' Mot. 16:8-10.)

"Res judicata is applicable whenever there is (1) an identity of claims, (2) a final judgment on the merits, and (3) privity between parties." U.S. v. Liquidators of European Federal Credit Bank, 630 F.3d 1139, 1150 (9th Cir. 2011) (citation and internal quotation marks omitted).

> When applied to administrative decisions, the res judicata doctrine is not as rigid as it is with courts; there is much flexibility which is intended to adapt the doctrine to the unique problems of administrative justice. Nevertheless, the doctrine retains full force when applied to adjudications of past facts, where the second proceeding involves the same claim or the same transaction.

Stuckey v. Weinberger, 488 F.2d 904, 911 (9th Cir. 1973) (citations and internal quotation marks omitted). "Although a dismissal because of lack of jurisdiction is not res judicata on the merits of the underlying action, a finding with respect to jurisdictional facts will be treated as res judicata in subsequent actions with respect to those facts." Gupta v. Thai Airways Intern., Ltd., 487 F.3d 759, 767 (9th Cir. 2007) (citation and internal quotation marks omitted).

The IBIA held that "nothing presently before the Board shows that BIA had any jurisdiction, in the circumstances in which the issue arose, to render a decision in the Tribe's disenrollment dispute." Cahto Tribe, 38 IBIA at 249. The IBIA "decline[d] to interpret [25 C.F.R.] Part 62 or the Tribe's ordinance for the purpose of determining whether Sloan's appeals would be cognizable under that part [since] . . . it [was] enough to note that neither the Superintendent nor the Regional Director purported to address Sloan's appeals." Id. at 247-48. The IBIA's holding was limited to a finding that the BIA lacked jurisdiction under the circumstances in which the issue arose. Id. at 249.

In the 2009 Decision, the BIA addressed Gene Sloan's appeals and asserted it had authority to act under 25 C.F.R. Part 62. (2009 Decision, AR 1-5.) The IBIA's decision was limited to the circumstances of the case and specifically did not address whether the BIA would have jurisdiction if it was addressing Gene Sloan's appeals and acting under the authority granted in 25 C.F.R. Part 62. Since the scope of the IBIA's ruling does not encompass the BIA's ability to act on Gene Sloan's appeals, the IBIA ruling does not bar the BIA's 2009 Decision.

**B. The BIA's Delay in Acting on Gene Sloan's Appeals**

The Tribe argues the BIA's "assumption of jurisdiction in the 2009 Decision was . . . arbitrary and capricious [since] [i]t was issued

more than 13 years after the Tribe's September 19, 1995 decision and was wholly inconsistent with the BIA's action for six years following the IBIA's 2002 decision[.]" (Mot. 19:11-14.) Defendants counter that the BIA did not "suddenly come to the conclusion that the appeals made by Gene Sloan in 1999 were still pending, and that . . . [it] did not arbitrarily reverse course one day after six years of silence or seeming acquiescence." (Defs.' Mot. 19:10-12 (citation and internal quotation marks omitted).)

"[A]n agency changing its course must supply a reasoned analysis indicating that prior policies and standards are being deliberately changed, not casually ignored, and if an agency glosses over or swerves from prior precedents without discussion it may cross the line from the tolerably terse to the intolerably mute." Northwest Environmental Defense Center v. Bonneville Power Admin., 477 F.3d 668, 687-88 (9th Cir. 2007). "That is, an agency must cogently explain why it has exercised its discretion in a given manner, and in reviewing that explanation, we must consider whether the decision was based on a consideration of the relevant factors and whether there has been a clear error of judgment." Id. at 687 (citation and internal quotation marks omitted).

The BIA's decision to rule on Gene Sloan's appeals was not a change in course or a change in prior policies, since the BIA's 2009 Decision is consistent with its prior decisions regarding the Tribe's 1995 disenrollment decision. For example, in July 1999, the Superintendent of the BIA asked the Tribe to reconsider its disenrollment decision; in February 2000, the Superintendent of the BIA issued a decision in which he refused to recognize the Tribe's decision to disenroll the Sloan/Heckers; and in December of 2000, the Regional

Director of the BIA issued a decision in which he refused to recognize the Tribe's decision to disenroll the Slaon/Heckers. (AR 105-07, 175-76, 182-83.) Therefore, the BIA's 2009 Decision was not a change in course or a change in prior policies.

Although it is evident the BIA did not decide Gene Sloan's appeals in a timely manner since the BIA did not act upon those appeals until 2009, it is also clear that Gene Sloan appealed the Tribe's decision in 1999. When the BIA acted on the appeals in 2009 that action was in response to the urging of Gene Sloan; Gene Sloan wrote a letter to the BIA in October 2008 in which he requested it act on his 1999 appeals. Even though the BIA was slow to act on Gene Sloan's appeals, this delay does not make the BIA's 2009 Decision arbitrary and capricious.

## C. Authority to Review the Tribe's Disenrollment Decision

The Tribe argues the BIA's re-enrollment decision is unlawful because the Tribe's governing documents, consisting of its Articles of Association and Ordinance Number 1, do not authorize the BIA to review the Tribe's disenrollment decision. (Pl.'s Mot. 25:10-13.) The Tribe argues that "even where a tribe may delegate to the BIA authority to review a matter, such as in the manner contemplated by 25 C.F.R. Part 62, the Tribe's delegation of authority must be express and in plain terms." Id. 23:15-17. The Tribe argues the BIA "misconstrued the Tribe's Enrollment Ordinance" since the "plain text [of Ordinance Number 1] does not allow appeals of tribal disenrollment decisions to the BIA[.]" Id. 25:10-12 (emphasis in original).

Defendants counter that the Tribe's governing documents do authorize the BIA's review of the Tribe's disenrollment decision that was appealed; Defendants rely on provisions in the Tribe's governing

documents as support for their position. (Defs.' Mot. 12:16-13:19.) Specifically, Defendants argue that sections 6 through 8 of Ordinance Number 1, "read together", "unquestionably provide for an appeal to the [BIA] for determinations by the Tribe as to eligibility or ineligibility for tribal membership." (Defs.' Reply 4:25; Defs.' Mot. 13:21-14:1.)

"The regulations in [25 C.F.R. Part 62] . . . provide procedures for the filing of appeals from adverse enrollment actions by tribal committees, [if] . . . [a]n appeal to the Secretary is provided for in the tribal governing document." 25 C.F.R. § 62.2(b). 25 C.F.R. § 62.4(a)(3) prescribes: "A person who is the subject of an adverse enrollment action may file . . . an appeal. An adverse enrollment action is: . . . the disenrollment of a tribal member by a tribal committee when the tribal governing document provides for an appeal of the action to the Secretary[.]"

The Tribe's governing documents provide for an appeal to the BIA from adverse enrollment decisions. Section 6 of Ordinance Number 1 provides: "[a] person disapproved for enrollment" may appeal to the BIA; section 7 states the membership roll is to "be prepared with a certification as to its correctness by the . . . [BIA][;]" and section 8 states the membership roll is to be kept current by "making corrections as necessary, including deleting of names of persons on the roll who were placed there erroneously, fraudulently, [or] otherwise incorrectly[.]" (Ordinance No. 1, AR 282, 285.) These sections provide the BIA authority to review the subject disenrollment decision.

### D. BIA's Reversal of the Tribe's Disenrollment Decision

However, the Tribe also argues its disenrollment decision is based upon its interpretation of its own tribal governing documents, and therefore, is an interpretation based on its tribal sovereign authority

to which the BIA must give deference. (Pl.'s Mot. 27:3-6.) Defendants counter the Tribe's disenrollment decision is not based on the Tribe's interpretation of its governing documents, but rather constitutes the Tribe's misinterpretation of federal law prescribed in 25 U.S.C. § 1300i et. seq., the Hoopa Yurok Settlement Act, and the Initial Yurok Voter List prepared by the BIA in 1979, prior to the enactment of the Hoopa Yurok Settlement Act. (Defs.' Mot. 23:9-10.)

The BIA's decision shall be set aside only if it is "not in accordance with law." 5 U.S.C. § 706(2)(A). "[U]nder the doctrines of tribal sovereignty and self-determination, a tribe has the right initially to interpret its own governing documents in resolving internal disputes, and the [BIA] must give deference to a tribe's reasonable interpretation of its own laws." Ransom v. Babbitt, 69 F. Supp. 2d 141, 150 (D.D.C. 1999) (internal quotation marks omitted) (emphasis added). However, "the reviewing court shall decide all relevant questions of law, [and] interpret constitutional and statutory provisions[.]" 5 U.S.C. § 706.

The Tribe based its decision on Article III(A)(3) of the Tribe's Articles of Association which prescribes: "[p]ersons who meet the requirements [of membership] . . . , shall be ineligible for membership if they have been affiliated with any other tribe, group or band to the extent of (a) being included on a formal membership roll, . . . [or] (c) having been named as a distributee or dependent of a distributee in a reservation distribution plan." (Articles of Ass'n III(A), AR 286-87.) "In its September 19, 1995 decision, the [Tribe] found that the [Sloan/Heckers] 'have been affiliated with other tribes by being included on formal membership rolls and/or . . . have been a distributee of a reservation distribution plan, namely the Hoopa/Yurok

settlement' and thus were ineligible for membership under Article III.A.3 of the Tribe's Articles of Association." (Pl.'s SUF ¶ 7; Defs.' SUF ¶ 2.) The Tribe relied on the "'Initial Yurok Voter List' dated June 21, 1979" for its conclusion that the Sloan/Heckers "were . . . on the membership rolls of the Yurok Tribe[.]" (Pl.'s Mot. 33:1; Disenrollment Meeting Minutes, AR 223.)

The Tribe argues the Hoopa Yurok Settlement Act is a "distribution of Reservation assets" within the meaning of "reservation distribution plan" in its Articles of Association. (Pl.'s Mot. 32:5.) However, what the Tribe characterizes as a distribution of reservation assets is a legal settlement with the United States government, which federal law has not defined as a distribution of reservation assets.

As explained in the Senate Report on the Hoopa Yurok Settlement Act, the Act is intended to "resolve long standing litigation between the United States, the Hoop Valley Tribe and a large number of individual Indians[.]" S. Rep. No. 100-564, at 1 (1988). 25 U.S.C. § 1300i-3 prescribes that the Hoopa Yurok Settlement Act establish the Hoopa-Yurok Settlement Fund, which is composed of "monies derived from the joint reservation which are held in trust" (25 U.S.C. § 1300i (b)(1)) and a federal government monetary settlement contribution of $10,000,000 (25 U.S.C. § 1300i-4(e)). The Senate Report explains "[t]he Fund, with the Federal share and with any earned income, is to be available to make the payments authorized by [25 U.S.C. § 1300i-5(d)]." S. Rep. No. 100-564, at 20. 25 U.S.C. § 1300i-5(d) provides a lump sum payment option; "[t]he option to elect a lump sum payment under this section is provided solely as a mechanism to resolve the complex litigation[.]" 25 U.S.C. § 1300i-5(d)(2). Therefore, the Sloan/Hecker

family members who received the lump sum payment option under 25 U.S.C. § 1300i-5(d) did not receive a distribution of reservation assets.

Further, contrary to the Tribe's argument, the Initial Yurok Voter List does not constitute a membership roll since the "the voters' list clearly is not a membership roll for the Yurok Tribe and inclusion on or exclusion from the list is not determinative of whether a person will be eligible for membership in the Yurok Tribe." Organization of the Yurok Tribe-Voting for Interim Tribal Governing Committee; Qualification and Procedures for Preparing a Voting List, 44 Fed. Reg. 24536 (Apr. 25, 1979) (to be codified at 25 CFR pt. 55). Therefore the BIA's 2009 Decision was in accordance with law.

### E. Scope of Gene Sloan's Appeals

The Tribe argues Gene Sloan's appeal was solely an appeal for himself, not his family, and therefore, the BIA can only review the Tribe's decision to disenroll Gene Sloan, not the entire Sloan/Hecker family. (Pl.'s Mot. 34:6-24.) The Tribe argues the BIA's decision was "in excess of authority under federal regulations and contrary to law" since the BIA did not follow 25 C.F.R. § 62.5(b) which requires the name of each individual appealing to be listed on the appeal. Id. 34:9-14.

Defendants counter that all of the individuals affected by the Tribe's disenrollment decision are included in enclosures to Gene Sloan's June 24, 1999 appeal and are therefore incorporated in that appeal. (Defs.' Mot. 14:18-20.)

In his letter dated June 24, 1999, Gene Sloan "formally request[ed] an appeal regarding our (Sloan/Hecker family members) removal from the Tribe Rolls . . . , in Resolution 99-6-3 and in the original minutes of September 1995." (AR 190.) Included with the June 24, 1999, letter were enclosures, including a copy of the Cahto Tribe

14

Minutes from September 8, 1995 which listed the twenty two members of the Tribe who were disenrolled. Id. 192, 222.

25 C.F.R. § 62.5(b) prescribes: "An appeal may be on behalf of more than one person. However, the name of each appellant must be listed in the appeal." "Traditionally, an agency's interpretation of its own regulation is entitled to a high degree of deference." Kwan v. Donovan, 777 F.2d 479, 480 (9th Cir. 1985). Since Gene Sloan's letter dated June 24, 1999, in which he "formally request[ed] an appeal regarding our (Sloan/Hecker family members) removal from the Tribe Rolls" included enclosures which listed the twenty two members of the Sloan/Hecker family who were disenrolled, Gene Sloan's appeal sufficiently listed each appellant under 25 C.F.R. § 62.5(b). Therefore, the BIA's 2009 Decision was not in excess of it authority under 25 C.F.R. § 62.5(b) or contrary to law.

## IV. CONCLUSION

For the foregoing reasons, Plaintiff's motion for summary judgment is DENIED, Defendants' motion for summary judgment is GRANTED, and the BIA's 2009 Decision is affirmed. Judgment shall be entered in favor of Defendants. This case shall be closed.

Dated:  September 21, 2011

_____
GARLAND E. BURRELL, JR.
United States District Judge